This is the evidentiary hearing requested by Mr. Haynes in response to the court's order to show cause where the court should not impose reciprocal discipline based on his disbarment from the United States District Court for the defense of the United States Constitution. Mr. Haynes, I wanted to remind you of the limited scope of this proceeding, namely that the question here is limited to whether you will be permitted to continue to practice at the United States Court of Appeals for the Ninth Circuit, and nothing that we do here will affect your standing or status as a member of any other bar, the California Bar or the Northern District Bar. And as I can tell from your submissions, you understand that the court ordinarily will impose reciprocal discipline unless you as the respondent bear the burden of showing by clear and convincing evidence one of three factors identified originally in a United States Supreme Court case, Selling v. Radford, and modified in language. Those three factors are whether the proceedings in the Northern District provided you with due process, that is, notice and opportunity to be heard. Second, whether the evidentiary proof was sufficient to support the disbarment. And third, whether some other grave injustice would occur by the court imposing reciprocal discipline. All right. So, because I'm going to be asking you some questions here, I'd like to begin by having the courtroom deputy put you under oath so that all of your responses are under oath. Yes, I do. Gregory Melvin Haynes. All right. So, Mr. Haynes, I've read your materials, the submissions that you have in this matter. I also reviewed the briefs and some of the record in the direct criminal appeal that was decided last year. I'm sorry. I beg your pardon. The direct appeal from the disciplinary proceeding. That was a misstatement. So, this is an odd posture, an unusual posture in that our court, a three-judge panel of this court, has already passed on some of the issues that are involved in this case. And so, the orders that we've issued in this case have alerted you to be prepared to address the question whether there's any preclusive effect and to what extent there is preclusive effect from the prior three-judge decision on issues that you raised in that matter. All right. So, this is the hearing that you've requested, and you have the burden. So, I do want to assure you that I have read and studied the submissions. So, I don't want you to feel like you're obligated to go through everything, because I think I'm generally familiar with the factual background, the posture of the case, and the issues. And I do want to give you an opportunity, though, if you feel that there are particular points you want to make, and I do have some questions I want to ask you. So, with that in mind, how would you propose to proceed at this hearing? Well, if you have some questions, I would be more than happy to address those. All right. So, why don't I go through some questions, and then that may prompt you, and then I'm going to give you an opportunity to say what you need to say, if we're not completely covered by my questions. You don't have to say anything further. Okay. So, the first question I have basically deals with this whole issue of the earlier appeal in this matter. And so, my general sense is that if a three-judge panel has ruled on the question, for example, let me give you an example. One of the issues here is whether the disciplinary rule, in effect, was an adequate basis. And you raised in your direct appeal the issue about the limited nature of the title. It was reciprocal discipline and conviction of a felony. And you raised the issue that because of that title, that it was not an adequate basis.  And the three-judge panel, in the unpublished decision, clearly rejected it. Correct. All right. So, is there any basis that you can identify for me, in my report and recommendation in this matter, do you see any ground for me to second-guess the three-judge panel? And if so, what authority would you cite for that? I would say it would be second-guessing the panel, as it would be reviewing that which the panel didn't have the opportunity to review, and, hence, arriving at a different decision, which they would probably arrive at if they had the same information before them. We did raise the issue of the title, and that was the primary focus on appeal. During, after the briefing, two cases came down, which significantly impact the case, but weren't properly briefed because it was after the briefing. And so they didn't, the court really didn't get a sense of those issues. So those are those two Supreme Court cases you cited? There are two Supreme Court cases I cited. There are three that I cited, and two came after. And the two are, I did cite, and they are, Oh, 27. Okay. So they are Nichols v. United States and Surgeon v. Frost. Okay, so Nichols, what did Nichols hold? Nichols held that when a statute doesn't give the court authority to do an act, the judiciary, the Supreme Court, the judiciary can't supply that omitted authority. And in this case, the argument is that they omitted that authority. And that is in conjunction with Surgeon v. Frost. Didn't somewhere in the court say that the body of the disciplinary rule provided the authority for doing an original disciplinary process? No. What the court did was, in violation of Surgeon v. Frost, is just assume that there was authority. So they don't address it. The court simply states that the statute authorizes it. It says on page two of the docket for the opinion, it states the rules authorize it. And then it goes through the various items. But before we go into that, which is relevant, we have to remember, under Surgeon v. Frost, we have to look at the individual language in harmony with the overall statute. And that's what the court failed to do. Which, these two cases combined, all three of them combined, indicate that there was no authority. So, for example, the court says under 11-6A-4, the court can refer to the committee. That's true. And then it says, so once it gets referred to the committee, then it indicates that the committee under 11-7C can institute, investigate members of the bar engaging in unprofessional conduct in connection with the district court. So, that raises two items. First, when it is referred from 11-6A to the committee, what authority does the committee have? The committee's authority is indicated in 11-7C. And that is reciprocal discipline. So, now. Well, let me ask you this then. If that were true, what meaning would it have to say, reciprocal discipline means discipline that occurred in some other forum, correct? So, then why would the 11-7C empower the committee to investigate charges that a member of the bar has engaged in unprofessional conduct in connection with an action in the district? Correct. That's just the point. They don't say unprofessional conduct in the practice of law in the district court. That's what they say in the mini version. Here, it's a little bit different. They're saying in connection with. So, it's not unprofessional conduct in the district court, but it's in connection with it. So, that gives us the broader implication that it's referring to something else. In other words, if you get disbarred in another district, then that is a conduct in connection with the district court. If something happens, a felony conviction, that can be in connection to the district court. Now, the courts are brilliant, and so when they wrote that, they had to have a meaning in mind. When they rewrote it, they said, to make it applicable, they said the committee can investigate matters that arise in the practice of law in the district court. That's under the general discipline. Now, they still have the separate... I'm going to have to stop you, because you lost me there. I don't see how, if you happen to be a member of the State Bar of Arizona, and the State Bar of California, and you got disciplined because of some discovery dispute that occurred in an Arizona state court action, they suspended you for six months, then you come in, and this is reported to the standing committee, I don't see how that action, that discovery dispute in Arizona, could be unprofessional conduct in connection with an action in the district. Well, it is, but see, it's in connection. It's not in it. It's in connection. I respectfully disagree with your analysis, because I think that the words in connection with the district has to be something that happens in the district. Otherwise, it would be just no limitation at all. In the revised version that authorizes general discipline, they say in the practice of law in district court. So they make a distinction. So there is a distinction between the two. And so the question is, what did they mean? So that's the big question, and if we look at the overall scheme, which Sturgeon requires us to do, then we say, well, the title does say felony conviction and reciprocal. And then we look at Yates, and Yates does say we have to consider that. So now we're looking at we're getting more information that suggests that it is limited. So let me just stop you there. You're saying Nichols stands for the proposition that... Nichols says that if the statute doesn't authorize it, the court can't judicially grant it. So if the statute doesn't authorize something, the court can't judicially add to it. Correct. So then Sturgeon, what does Sturgeon say? Sturgeon says that you can't look at that, you can't microanalyze the sentence. Because as the court just noted, you could probably say in connection with in district court has a broader meaning. So when you look at this particular section, Sturgeon v. Frost says look at it with a view for the overall statutory scheme. Because you have to view it in context. View it in context. Correct. And so now we see we have a limit and we have a statute that the section says it's limited to felony conviction and reciprocal. And the language is consistent with it because when they do change it, they don't say that. They say practice before the district court. Then let's look at some of the other sections. Let's say 11.685. That's when a judge refers it to the chief judge. Now, when he refers it to the chief judge, the chief judge has one thing to do. That's all he can do. And that is determine whether or not he's going to issue an ordinal call for reciprocal discipline under 11-7. So let me ask you this question. Under the original, the earlier version, was there any mechanism for the Northern District of California to impose original discipline on an attorney? Of course. Of course. And how would that work? What was the process that you think could have been applied? The one that normally is applied. If a judge sees misconduct, he can say, we're going to deal with that right now. We'll deal with that. That's how they deal with it. Because he's a judge, he can deal with it. Or he could send a... Hold on a second. How would he deal with it? He could order, he could have a disciplinary hearing right on the spot. He could conduct the discipline himself. What authority is there for that? He has the inherent power to discipline attorneys. In the section, he does a contempt sanction. But he has the power, and the statute also gives it to him, for him to deal with misconduct. To disbar an attorney. He would have the authority to disbar an attorney as a judicial officer. He would have to hear him. He would have to give him notice. And he could do that. And this case would have that. If he believes that there is misconduct. Okay. So in this case, I guess Judge Hamilton believed that there was misconduct. No. Judge Hamilton was assigned the case later. She came involved as part of the process under the statute. So once she got there, she was just operating under the statute. But the idea was, and if you read the statute, you sense this, is that they don't ship off general discipline to another court. And the reason for that is that you could have a lot of problems. Because if you have a real minor, some judges look at different things differently. And so you could have one judge who doesn't particularly mind certain things and then he might send it to another judge who thinks that that's a terrible, terrible thing. Or it's not evenly applied. Is your position that with respect to the Landry matter, that the only judge who could have imposed discipline in this case is Magistrate Judge James or Judge Condon? I mean, under the statute, that's how it would proceed. Now, what the judge could do under the statute, the judge could also send it to the State Bar. He could refer to the State Bar. And the State Bar could do what they will. But he can't refer to the Chief Judge under the statute. Because the statute says if you refer to the Chief Judge, you refer for reciprocal order to show cause under 11-7. Okay. I understand your argument about this. I don't want to use all your time on this issue because I have other questions. This is a quasi-criminal statute and therefore the statute is strictly construed in favor of the respondent. So if there's any question, then the court should rule it should limit its inquiry such that it favors the respondent. And that's under In Re Rufola. I'm familiar with that. Okay, right. So if it's a criminal statute or this is a quasi-criminal case, so you strictly construe the statute in favor of the respondent, which is consistent. And then Nichols gives that a little bit more emphasis in that you don't judicially create items that you do this idea. Okay, so we've covered this notion that you've raised about this new Supreme Court authority of Nichols, Sturgeon, and well, Yates was already out. But Nichols and Sturgeon in any way, that provides some sort of a new approach to the issues that came after the direct appeal. Are there any other issues? You should be correct, but it was after the briefing. I did submit a letter, but I don't think you got the gist. Oh, I see. So aside from this notion of these two Supreme Court cases, are there any other issues that you are raising now in this reciprocal proceeding that were not raised in the direct appeal? Well, with regard to the statutory issue? Any issue. Well, yes. I get the statutory issue. You've already laid that out. I have that down. There are some other issues with that. I think one thing that's significant is that in the new statute, under the general discipline, they have a remedial plan. A remedial plan is for general discipline. Under the new statute, they don't have a remedial plan for the reciprocal, because you get whatever you got in the reciprocal. And in the old statute, the one I was prosecuted under, there is a remedial plan. So that suggests also that it's not a general discipline. It's for reciprocal. And when they revised it to allow the committee to conduct general discipline, they put a remedial plan. And that's the hallmark of any general discipline plan. But again, as to the reciprocal discipline, they don't have it. They didn't have it then, and they don't have it now. And also, they increased the number because now, since the number of people that can prosecute are the number of members, because they can prosecute under general discipline than they could under reciprocal. So, if I understand you correctly, the old rule had no remedial provision at all? Correct. None. And the new rule has it limited to original? Correct. And because otherwise, if you don't have a remedial plan, it kind of goes against the general discipline nature, and it tends to I understand that point. Okay. I got you. One other thing, just because the court did note that, in her footnote, she states that they authorize the same procedure. Now, the procedure in the old... I'm talking... Oh, no. This is the Court of Appeal order. Footnote 1. They say they authorize the same procedure in footnote 1. Now, footnote, that's a completely different procedure. They're different. For example, under the old procedure, which was reciprocal, the respondent is entitled to a trial. And so, I was entitled to a trial. Under the new provision, you're not entitled to a trial. It's a completely different procedure. And that's why they wanted me to opt for the new procedure so that it wouldn't be a trial. But the old procedure provided for a trial, which they indicated you were going to get, and so you use it. So you have, for example, under the new provision, you don't have a trial, but you do have a remedial plan. Under the old provision, you had a trial and no remedial plan. And so, when the question was, well, would you like to go under the new plan? The only problem with that is, under the posture where we were, all of the remedial plan had long been gone. And the only thing left in the new plan was the denial of a trial. So, at that late stage, to switch would be kind of difficult, because the new plan anticipated you already tried to mediate it. And so we have to now litigate it. And so, it would just be kind of complex to say, okay, I'll go through with the new plan, but I don't get any of the benefits of it. So, there's a because with the old plan, you get discovery, but you do a lot. Trial, discovery, just like a regular trial, but no mediation. In the new plan, you get the mediation and so forth. And then, just to further aggravate that process, the committee and this will go into the next due process violation, the committee did not meet with me before they filed a petition where the statute states, once you determine what discipline you're going to submit, you have to contact the other party. You don't have to... You raised that in your brief, didn't you? That is correct. I raised that. But that just shows the conflict with the two. And the record now is a little bit more developed with regard to how they differ. That loss, in light of how the statutes have changed, is significant. But it's significant for another reason. Now we're going to the next issue. And that is the Ford, the Flowers v. Jones, where the committee and the court, they received a document. They sent the order to show cause. In the order to show cause, it came back in the envelope, and in the envelope said, no such address. And rather than contacting me to find out why there was a problem, they went to a summary judgment. Under Flowers, you're supposed to contact the attorney. Now, the court didn't address the misconduct of the committee. They knew my address, my e-mail address, and my phone number. And they had agreed to e-mail all documents to me. And they had. All documents they had sent to me, up until the order to show cause, they had e-mailed. So, with respect to that whole issue of the misaddressed mail and all that, ultimately, they gave you an opportunity to respond to everything. In order to show cause, you had a fresh time to do that. You had an opportunity to respond to all the summary judgment matters. And in a way, you just had a longer period of time where you were able to practice without the threat of, or without being disbarred. So, I guess my question to you is, why didn't the redo of the entire procedure from ground floor cure any error about notice beforehand, when you ultimately got notice and an opportunity to respond to the order to show cause and to the summary judgment motion? Okay. All right. So, yes. The problem there is twofold. So, first I am aware of that what you just requested, and I want to just set it up to give you the answer. But first I want to talk about something else just briefly to set it up, just so you can begin to see the type of harm that it caused. First, in the Rufalo, that's what I have to respond to, the petition. There is no allegation that the appeal was dismissed. So, I respond to the petition. Now, as a result of not getting the petition, and then getting, having to do the summary, filing the summary judgment, and then them not taking it off calendar right away, but I had to litigate it. I filed a motion to set it aside. I responded to it just letting them know what we were going to respond to, and the court denied it initially. I kept on talking with the committee, and then the committee said, okay, you know what, we made a mistake. And then the court, they agreed, and they she changed her decision. Now, she changed her decision about July 7th, 5th or 7th. But she didn't, we didn't get notice of it. So we were talking about that until the 11th, because the emails indicated when we were saying can you take it off calendar on, you know, 997, 994 I sent them a stipulation on July 11th to take it off calendar. So now it seemed close. The committee had said, okay, we made a mistake. And I'm kind of off the hook now, because I got two appeals going, they know it. Landry and Haynes. I'm working on them both. I'm getting extensions of time. This pops up in the middle, and I'm trying to get it set aside so I can work with the others. So on the finally on the 11th, I sent them a stipulation, and we'll hopefully get it done. And they say, okay, the court, late in the afternoon, we got information that the court took it off calendar. So at like 5 o'clock, 6 o'clock, 5 o'clock the email was saying take it off calendar. Alright, so, now on July 14th, and these are just two emails I'll say, these are not in the court record, but it just shows a little bit more, it's more proof of how the notice issued harmed the respondent. The respondent was able to respond to the petition, but because he responded to the petition, he had other things that were set aside. For example, okay, on the 14th, I advised them that I needed more time, because I had these two appeals going. And that since they had taken up so much time here, would they stipulate to give me more time to file a response to the order to show cause? That's the email of July 14th. And it ends, please contact me and let me know whether you have a position on taking the matter off calendar or delaying the matter due to the briefing in Haines and the Lambert matter. Okay, that's on the 14th. They write back and say, okay, we're not going to take it off calendar, you've got enough time. Now they caused all this problem and you've got two appeals going, you've got a lot of things going, and then all of a sudden in the middle of nowhere to get a summary judgment that you're getting disbarred, it has an impact on you. And then, the most troubling aspect of it was you couldn't understand why. I couldn't understand how I could not have gotten it. And then finally we realized that they just sent it to the wrong address and it helped, but you're in the midst of something. So on the 15th, I wrote them back, I emailed them back, and I said that a reversal would move some of the issues in the petition. And I asked them to reconsider so I could get more time. And then in the same, that was at 415, 418, and then I saw my email and then I realized that in the carroll matter, they had denied the continuance in the carroll because I didn't file the request on July 11th. I filed it on the 12th and they denied the request. And I'm going to get into this a little bit more, but once they denied the request, which court denied the request? Denied the request for an extension of time for the fourth extension of time in the Haynes matter. And what they said is that I had 14 days to file that response. To file the brief. To file the brief. Or it's going to be dismissed and they'll talk about it and it's it. This is after multiple earlier requests for extension. This is the fourth one, correct. And then in Landry there were even more than that. Correct. Now the problem with that, the way I had it was Landry was already in its sixth request. And so I had to focus on Landry. But when the Ninth Circuit denied the request in Haynes and said I have to do it in 14 days, I then I worked on that to get that done. And then in the meantime, I had to file the response to the order to show cause because they wouldn't continue. So I had to take care of this and order to show cause and so I asked for two other extensions in the Landry. And I wasn't able to do it. So basically what you're saying, it's not so much that, you're just saying that there was a denial of your some reasonable right you had by the denial of the extensions of time. I think what you're, the basic concern that you're raising here is that you were unfairly denied extensions of time to get everything done. Well, not so much that I was unfairly denied, but instead that one, I was working on the problem the due process notice problem when it was the Haynes matter was denied because it was one day late. And I was working on the due process problem response to the order to show cause right in the middle of the briefing and the committee wouldn't give any additional time notwithstanding they had caused the problem. It was their problem. And so I was in the midst of it. And not only, and then they get the benefit of it because it wasn't in the petition, but after it was dismissed they then included it in the summary judgment. You're talking about the Landry dismissal. Correct. You've raised that point adequately in the brief. We have a little more than an hour left for this hearing. I want to make sure that I get the questions I have answered. So I still have a pending question to you that I want you to answer and that is, you've already identified this Nichols, Sturgeon, Yates set of cases that you say provide some new analysis that wasn't available to the three-judge panel. So I just want to make sure that I understand whether there are any other issues that you are raising in this reciprocal discipline proceeding that you didn't raise on direct appeal. Yeah, two. First, these two emails show a little bit more. Do you want those emails? Do you want to make those part of this record? I'll provisionally accept them. I'll take a look at them. Are you referring to them right now? Yes. Do you want to give me a copy? Do you have a copy for me? Yes, I do. Do you want to give it to the courtroom deputy? I do have it. So there are two emails that you now have that you didn't have earlier? Yeah. I didn't put these emails in it because I thought it covered it elsewhere. Is this newly discovered or is it just stuff that you forgot to put in your brief? It was not in the record. In other words, I have put in the record the email that of 994, which indicates that I was trying to work with him on the appeal. Can I look at these emails that you're talking about? This was not part of the record of the disciplinary proceeding. It was not part of the record of the appeal, but it's matter that you think is relevant to this reciprocal proceeding, even though it wasn't ever part of the record. Well, it just goes to show a stronger proof of how the due process violation caused harm. I said earlier they didn't agree to extend time. This is what you just were talking about. Correct. And these indicate that they wouldn't do it and I just got notice that they denied it. And then because it was dismissed, they then put that as a factor in disbarment. And under Enri Rufala, this was after I filed the response. So I just want to make sure I understand exactly what your point is and your issue is. You're saying that as a result of the delay and the failure to give you a continuance, you defaulted in the Court of Appeals on Landry and they added that default to the amended petition and that this additional element of the appellate default was due to the fact that they delayed not only delayed but they didn't have a due process violation by not contacting me. They delayed by not giving you the right address and then by the time they corrected the error, it was at a time during which because of their refusal to give you an extension, you weren't able to comply with the briefing schedule in Landry. That case got defaulted. That was added and you were not getting all of that? Correct. And when they didn't amend the petition, they just added it. I objected to it, but it wasn't forward. Okay. So let me ask you, I understand that issue now. Now, aside from those two that you've identified now. Let me just add something else to that which is relevant to the other issues. The city attorney's office and this is new evidence because it wasn't admitted with the court of appeal under Ms. Harper, she encouraged her deputies to demonize, vilify, and polarize the opposing attorney. Now, it's also significant, I think, that in both of those appeals, Landry and Haynes is with the city. And the city attorney in Landry, I filed a motion for administering. When you say Haynes, you're talking about the Conroe case? Correct. Well, in the Conroe, yes, Conroe, Haynes, you know, right now they refer to Haynes, but I get it because it's now the sanction issue, the attorney fees sanction issue. Right, right. So what they in the Landry matter, and I'm not sure whether this is in the record, but I do have just the transcripts of the Landry appeal and Haynes appeal Conroe. And that is on June 23rd, I filed a motion for administrative release. On June 24th, the city filed a motion to dismiss in the Landry appeal. Go back one stage. What was the administrative release? In the district court for the discipline matter, once I found out, I got the notice because it went to the wrong address and somebody wrote on it 244, 2443. So they sent it to me and I got it but it was after time to respond. When I got it, I filed a motion. The other side wouldn't set it aside. So I had to file a motion for administrative release to try to get it taken off calendar or something. But the problem was I couldn't exactly explain why I didn't get it because they said they sent it to 244 and I assume they did, but they didn't. They sent it to 244 so I couldn't explain it. I talked to the people, why didn't you get it to me? And they said they didn't get it. So you had an actual notice in June? I had notice in June, I think it's in the record, June 17th, and I filed an administrative motion on June 23rd. I didn't mean to interrupt you. And then you were saying the next day the Landry moved to... Yes, they then moved to dismiss, I was on the... Landry, a discovery sanction, terminating sanction. No, no, they moved to dismiss the appeal. Because he was on appeal. So they moved to dismiss the appeal at that time. And then in Caldwell, the city, they then objected to the late filing. So the city and they were working, the committee was working with the city to harm me. Let me stop you right there. Okay. What evidence is there that the committee was working with the city? Okay, it's circumstantial and I'll give it to you. One, what I just said, and two, the city, I think this is a significant one and I submitted this in the documentation that I submitted and that is that one, the city, they submitted declarations in support of the summary judgment motion. And again, they did call me, they did email me, they knew I wasn't getting it because it was coming back, and rather than calling me, they had, they prepared a summary judgment motion. A lot of work, had to interview witnesses to get their statements. And so they got statements from Zaire, Landry, Pratt, and also Bumgart. Now, Landry, Pratt, and Zaire were witnesses, but they also got one as to the mailing because, I read that, that's Bumgart there. That's because she was in constant communication with me, okay, because she was mailing herself. Now, in the documents that I showed you now, so she filed that on June the 9th, on June the 9th, and on June... And when you say that, that was her affidavit that says, I communicate with this guy and I always communicate with him at 2443, that's his address. Correct, that's correct. Then, so she knew about the motion. And then on June 9th, I saw her. We were at a hearing together for 30 minutes, not to mention other work. And so, now, so... Okay, the thing is that now the attorney who was previously on the case, we had a good relationship. He was telling me, Greg, I don't want to do this, she's doing it. And so he put that in the documents, put it to show that they were being unreasonable. So he got off the case. They put Bumgart on the case because she was more in compliance with the policy that the city had. So, in essence, this is circumstantial, they had to know, they had to incur, that she wouldn't tell me about the motion. You know, all of them knew it, and they didn't tell me, and the committee, they knew, and I already discovered, but I think that they told her not to tell me as well. Well, I mean, how do you know that she knew, other than she was asked for an affidavit about where she communicates with you? Okay, because on the affidavit, it states when the motion was. And she, with Ms. Hopper, would have been aware that I wasn't aware of it. Ms. Hopper was very active. She was calling the state bar, she was calling the district court, and she had all the deputy district attorneys file motions in federal court and request that any deposition that I went to, I had to go through a metal detector. And this is with attorneys that I've dealt with for years. And then one attorney, he said, Greg, that's your brief with Ms. Hopper. But I couldn't understand what was going on. So she was actively involved in the process and working with the committee. Now, for example, I didn't know that she was the one that encouraged the filing of the police report until I got to discovery. Because in the discovery, Judge Hamilton, she limited my questions. I just had one last one. And the last one was, who encouraged you to do it? To file the police report, which was falsely. And he said it was Ms. Hopper. Correct. And she had some influence. They filed the police report by phone for a felony. And it was recorded. And this kind of, it only takes in more significance as you see the other city attorneys. So I'm getting back to this question about whether this was something that was before the court on your direct appeal. And you're saying that no, it wasn't because you got some access to some information you didn't have before? Correct. How did you get that? The city attorney, they were aware of Ms. Hopper. But, you know, they couldn't tell me, or they wouldn't want to say anything like that because I have an appeal, another case against them. Which the court might take additional to that. So I have another case for them filing the false police report. So they couldn't say it. But she started I guess investigating the city attorney's office. I'm sorry to interrupt. I'm just trying to figure out how you got this information. Why this wasn't before the court in the direct appeal? They fired her. She sued them. And in suing them, they put in information against her. And therefore it was in the court record and I looked in the court record on the summary judgment motion and I found it. You got this in, the stuff that you have here, was public record? It was in the summary judgment was filed You're talking about the summary judgment in the Hepper claimant versus city Herrera and everybody else. So I noticed that there's a deposition testimony that you submitted that says highly confidential. How did you get that? If you looked at it, some of it it's not all there, but some of it the highly confidential part they redact or take out or don't put in. Then they put in the non-confidential part and they make that public. So it says highly confidential But it's all public, what you got? I got it out of the court record. And so this was not available to you early because it was just a subsequent lawsuit? Correct. So I've read your arguments about the relevance of the Hepper testimony That puts things in different perspectives. When I have a problem with an attorney, I talk to the supervisor In these cases, I talk to the supervisor I sent letters to Ms. Harper And they all said Ms. Harper knows, but she's encouraging them So that is I think significant because it shows their motivation This came out because I think it's kind of relevant because the committee, I believe, was working with the witnesses in coordinating their activities and that assisted in keeping me uninformed about the summary judgment motion and the order so called until the last minute. The hope was I wouldn't even get it So you think that the Hepper transcripts show a plan to keep you uninformed? I think it's consistent with it, but more importantly it shows that the motivation of her deputies was to harm. For example Judge Scott Weiner, he told Judge White that I spit at a law enforcement officer. He knew that was false. He knew that was false. He stated it in a but didn't, you know, subsequently state it. So that completely false statement. Then he said I threatened to kick the ass of somebody, which I didn't. He just used that term because it's forceful. And then in the police report Zaire reportedly tells the police officer that I threatened to F him up. Now he doesn't, in his testimony, he doesn't remember that. So the underlining item is to vilify and by having the police prepare a report, it becomes more forceful. Once you see a police report that Haines committed a felony terrorist threat that is something that... I saw that in that Hepper letter. I know what you're referring to. Can I ask you, I have one question I wanted to ask you. Just maybe shifting a little bit on the focus here. Looking at the record, the district court docket and what I believe are undisputed facts, in the Cotterill case the district court granted summary judgment after you failed to respond to a summary judgment motion. No. Didn't it? No. I filed an opposition to the summary judgment motion. There's no question about that. Okay, so why was summary judgment granted in that case? Because the court made legal error, but they did grant it. The court considered my argument and rejected it. And the Court of Appeal considered those arguments and rejected them. Let me strike that. The appeal, Judge White accepted the opposition and he considered it and he denied it. They then filed a motion for sanctions. And that sanction motion was appealed. And the sanction motion was based on the underlying proceeding at one point lacking merit. And on the facts of the case, a subsequent case ruled that there was a due process violation for the exact reason I was arguing. And that is the Galloway case. But the court in that case ruled that a person who is detained has a constitutional right or that the lawyer cannot waive the right to appear for the detained person. And that was what I was arguing, but at the time there was no specific case that ruled that. The state cases said you could, but the trial court said that under the circumstances it was okay. But what the appellate court said subsequently was that it wasn't okay. And that the court had to determine that the person's ability to pay sanctions. Correct. But again, that Gil and Water, that came after that. But that was the argument, but Gil and Water which is at 717 3rd, 5th 3rd, 1070, Gil and Water said that the attorney cannot waive the person's appearance, and that's what I was arguing. And they were saying that it just wasn't worth it, but that's the constitutional principle that Gil and Water said. Then I also argued, because the detained people, the people under 5150 shouldn't be arrested, that the handcuffing of her and taking her from her house to the hospital and then strapping her to a gurney and leaving her was unreasonable, just a restraint process. They said in the court, Judge White said that that's not a constitutional violation. And so that was an argument that there was no basis for. But subsequently C.B. The case was C.B. The city of Sonora ruled an in-bank decision that handcuffing without injury can be an excessive force case. And it's interesting in that case, it was sharply divided. It was like a four to five decision. And the majority opinion said it was a clear violation, and the minority opinion said this is crazy. This is OK. This is OK. That was the minority position. It was absolutely OK. But the majority said it wasn't. And so I got a minority opinion view of it. And they said they shouldn't have done it, which is what the minority said. But the Ninth Circuit majority in-bank said it was. So, you know, nonetheless, we did file opposition to the summary judgment. And it was late, but I see that. Yeah. But it was filed. And that's one of the problems. You know, as we get more information, I believe that the city attorney may have had more impact in this case than I'm aware of, but I wasn't able to discover. One of the reasons for that is that in her letter to Judge Walker, Ms. Harper says that I lied to Ms. Carle by telling her that I lied to Ms. Carle by telling her that I filed a summary judgment on time. And evidence for that, she points to the language in my email where I said prior to the summary judgment, I had filed things on time. I told her I didn't. Obviously, I didn't I had. And so they use that so the committee, they put that in the petition as a reason for disbarment. But even they realized later they admitted that that wasn't the case. And so they stopped talking about it. And just for another matter, this is not a due process, but it just goes to the sufficiency of the evidence. It's difficult not to address because in the letter to okay, Mr. Zaire sent a letter to Judge Conte and he asked that a future deposition be in the courthouse. Now, this is what he says. He says if this is an isolated case of an attorney losing his cool, I wouldn't do this. In the letter, he doesn't say anything about me using any type of profanity at the time. He doesn't say that. Nothing about that. Then he says in the past, he says Mr. Haines has engaged in this conduct several times. He engaged in name calling against me several times. Now, that clearly indicates that if I hadn't used as his term profane name calling against him in the past, he wouldn't find the need to file this motion. That's the clear. Now, what I say in the declaration is his allegation of using profane name calling in prior instances is false. He refers to no such name calling because there are none. Now, so they took that claim that I was saying, I said nothing use no cuss words on October 8th. Now, that is if you look at what he states and you see the exact language that I used, which is that on page 5, line 14 through 18, you see what I was saying. Now, what Ms. Hawker did when she filed the letter is she zeroed in on another portion. If you look at page 5, line 14 to 16, you can see exactly what I was saying. His allegation of using profane name calling in prior instances is false. He refers to no such name calling because there are none. Now, and then in his statement he says, I wouldn't be doing this philosophy in school one time, and he says, but he's engaging profane name calling in several instances. So, that's why I say that's not true. Now, earlier I was, I guess, not as careful in how I said it. I said that the allegation of profane name calling is true, and there are no allegations prior to the incident of any profane name calling, and there are none. So, they take that statement out of context and try to say that I'm saying I didn't use any profane language on that thing. But, again, this is in response to the letter, and the letter refers to the prior and that's what I did. So, to argue, sorry, under Ruffalo they identified what I was responding to. They had three items. One was that I said I did not use any profane language on that day in the declaration. Now, that's not true. What I said is I didn't use any profane name calling in prior instances. So, that's to the extent that they're suggesting that this is the basis for misrepresentation that's insufficient. By proof of missing evidence it is not. But you raised this issue in the direct appeal, didn't you? Well, two things. One, perhaps I wasn't clear as to the reason, because it just seemed so obvious to me. Because I guess if you look, you could read it in more than one way. But I did raise it. But the court did do something that's kind of unusual and maybe it's legal error. And that is they didn't rule that this specific finding was false. They said, well, maybe there were some other things that he said was false. But this was the finding that the court relied on and that the trial court relied on. And this is not what the Court of Appeal seemed to be centered on. So, if the Court of Appeal was saying, well, he may not have lied about that, but he sure lied about other things, that's really you know, I would say it's clearly wrong. Because you deny that you repeatedly directed profane and abusive language toward opposing attorneys? Of course I do. I mean, you were talking... So we have the e-mails. We have e-mails. One attorney... And then we have the evidence of the courtroom hallway episode. You're talking about two instances. That's how... That's repeatedly. Well, okay, well... In the courtroom episode, there were several people who testified to you... Okay, what? Against attorneys and marshals and federal protectors... Well, first, the court has specifically ruled that those items weren't going to be addressed because I was assaulted by a police officer who was provoking me, who didn't show up at the hearing. He got served, but he didn't show up. And so, there were other circumstances that the trial court acknowledged. And therefore, she said, I'm not interested in what Mr. Hanson... Pardon? Mr. Hanson? Alvarez. Oh, Alvarez. What Alvarez said, because he was the one that I had the conversation with. But they still kind of brought that up. But that was not something to be addressed because the officer didn't show up. So, the other items that the court is saying is... And then also, as to those two instances, they were extenuating circumstances. Mr. Pratt repeatedly insulted me. Repeatedly. And I needed to do something just to have him not do it. And after... And I emailed that... The one with the email? Yes. It was just an email. The reason why it was effective is because somebody else read it and they didn't want to hear that. And so, he didn't want to... He acted differently. And he acted differently throughout. Because prior to that, he was... Even... He was rough. And this is in the documents. After that, when he called, he would refer... You know, he referred to the judge in unfavorable terms and his opinions. He would be upset at other people, but he wouldn't be upset at me. I documented it just so that I'd have a record of it. But that was one person who had been extremely unreasonable and mean-spirited and rude. With regard to Zaire, I was sitting down... My testimony is I was sitting down when he was talking. And at that time, I had a voice impediment. And so, I had difficulty talking and hearing. He repeatedly talked to me. And in a declaration just the other day, I indicated how unreasonable he had been throughout. And I did say he ought to shut up and he ought to grow up. And I was sitting down. He kept on doing it. And so, I stood up and I said, don't interrupt. He then said, I interrupted him in the past and he was going to continue to interrupt. And he used his hands to jab and hit my hand. And he said, I assaulted him. And he was going to get a marshal. He smiled and went to get the marshal. It was the most bizarre thing I've ever seen. That is what happened. And, you know, if you look at what he told the officers, he said, I was upset. I called him names. And I crowded him. Now, I told him it was a videotape. And so, he was, I think, more reluctant to say the things that he subsequently said. Once he found out that there was no videotape, also, Larson, he told the officers all I said, all I heard was F. And I did say, while I was sitting down, he should shut F up and grow the F up. I did say that. And in the police force, that's all he said. He said he heard F. Once he got back to his office, that's when he came up with all the other stuff. Okay, so there was also that other witness, Ms. Fillmore. So what evidence do you have that the committee knowingly offered false evidence? I think you said this. What evidence do you have that the committee knowingly offered false evidence through Ms. Fillmore? First, in their pretrial statement, they stated that she saw the entire incident from the beginning to the end. Let me give you the back track, just so you know where we're at. Ms. Fillmore saw, after I said what I said, he said, he then left and he went to get a clerk. The clerk came out, saw us, and then went to go find a marshal. I was talking with Larson. We concluded our discussion, so then I started to leave. Once I got to the elevator, the marshal came to ask me a question. That's when Ms. Fillmore first saw me. So she first saw me after the incident. And after the incident, the officer said I was going to be detained, and after about 30 minutes in the detention, Alvarez, he was asking me questions. And I was asking because, you know, I didn't want to seem like I was being detained. And people walking by couldn't really see it. They didn't know there was a lot of people standing and they couldn't really see it. And then, so, I'll get back to that. So, he was asking a lot of questions and I was answering them. Then he told me, if people were walking by, he told me I was lying about having a card, but not having a business card. In my briefcase. I didn't want to talk to him anymore, he was in my face. So I told him, I told him, F you. I had nothing else to say to him. And then he started, that's when he started saying, well, can't you say something better than that? But, it was only when he told me that I was lying about having a business card and that was problematic because it then appeared that I was being detained. So, what evidence do you have that the committee knowingly offered false evidence? Okay, so, first, in their pre-trial statement they said she saw everything from beginning to end. And in the petition. And now you're saying that actually, according to you, she saw only events that occurred after the marshal arrived. And that's what the committee. But that's not her testimony. Her testimony was that she heard you threaten Mr. Zaheer and say words to Mr. Zaheer and she saw you approaching him and she testified that she thought that Mr. Zaheer was afraid for his safety. Something like that. That was her testimony. So why is it, so first of all, why is it that you are saying that she saw only things beginning when the officer arrived? And second, what's your evidence that the committee knew this, knew that she was testifying falsely? Okay, so, the Okay, first, her testimony is that when she first saw me, I was with the African-American woman. That's her testimony. Was with? An African-American woman. The African-American. That is correct. So when she first saw me, the clerk was there. So it was after the incident. Okay? So, but she also testified that she saw you threatening Mr. Zaheer. No. What she testified to is that she was, I was face-to-face with somebody, very close. Close enough to kiss him. Six inches, less than that. Now, the only person that that was was Officer Alvarez. And he did, he said he wanted to search my, he wanted to see if I had a business card in my briefcase, so he took my briefcase out of my bag and the other officers told him to let me go. So, that's who I was talking to when she saw me. She just got confused. Because, if you think about it, there were six officers there. I was talking, if you look at the police report, you see there's six officers there. There was Hanson, the, you know, in the police, they're identified in the police report, there was Coughlin, Oberstein, Alvarez, there was a Colby, and one other officer, at least. So there were several officers there, and he took my statement, and Alvarez was right near me. And so, there was no way I would be that close to him. Also, he was sitting down, not standing up. Alvarez was standing up. Ms. Fillmore, you know, giving her the business card out, just got confused as to who I was talking to. Another significant fact is that no police report indicates that Alvarez assaulted me. They don't even, and then Hanson, for example, he says he didn't see it. Not that it didn't happen, he didn't see it. All the officers didn't see it. This is a common type of thing. They're not saying it didn't happen, they're saying he didn't see it. And then, in the direct testimony of Ms. Fillmore, you know, once you realize what happened, you can see how the direct is. The direct is, when did you first, where was Mr. Haynes when you saw him? And she said he was standing with other people. That implies that he was with during the conference. And then what did you see? She said he started getting upset. Now that was Mr. Alvarez. He was talking about Alvarez. And then she said more police officers came. And, you know, more officers, they were already there, but many more came. So, I objected to the leading questions, but the court said it's preliminary. And so that's how they presented it. They said where did you first see him? And she said with other people. They knew it was later. Now this is how they know it. This is how I know they know it was later. And because in the petition they referred to two incidents. The first one and then a later one where they said I was upset with Mrs. Zaire a second time. So in the petition there's two. But when they presented it, they presented it as if it was just one. And the court on hearing it accepted it as if it was just one incident. And then on appeal when I said that she couldn't have seen it and therefore she was testifying falsely, they said no. She didn't testify falsely because all she said was when she first saw me and that once I started talking to whomever it was, she says Zaire, more police officers came. So see that can all be in the second stage because... Okay. So we have a few more minutes left. I've asked you the questions that I needed answered. I appreciate that, that you were able to answer those. So I want to give you just an opportunity if there's anything that you feel like you have to say now that's not necessarily in response to my questions, I'll give you ten minutes or so to wrap it up. You don't have to. I've read all your papers. In the misrepresentation, I think the incident or the statement I think that's pretty clear that the intent was not to say that there was no profanity. In fact, in the paper I said in the declaration, the intent was not to say I did not use any profanity because in the declaration I do state I did call the officer's name. I did say that. So it's not that the only issue in the declaration was the issue that was raised in the letter and that was the prior and that was not false. And that's what the court decided. It wasn't the other thing. And the court specifically said that this is what she's dealing with. The court ruled also that it was false, that I did not cause a disturbance. I did not cause a disturbance. I did not cause a disturbance. Dyer went and made a false police report. You know, one of the things they said is that normally you don't have police response. Normally a lawyer Well, that's just a credibility question, isn't it? I mean, you have Zaheer claiming, you testified that he felt threatened and you have Larson saying that he thought you were threatening. To the extent that Fillmore's testimony is different than you say it is, the way the district court viewed it, she corroborated it as well. But let's even leave her out. Just Larson and Zaheer both testified at that evidentiary hearing that they felt that you were assaulting Zaheer, right? Well, that's their testimony, which I wasn't. And again, that is a credibility issue. And credibility issues aren't decided at summary judgment. And that's what this was. And that's one of the reasons why there's a violation of the due process. Because under Newman v. City of Fortuna, which is a Ninth Circuit case, actually was in Judge Helmington's courtroom, where the court said if there's a sharp dispute as to what happened, you can't resolve that. Now, did you raise this issue in your brief? Yes. Yes. I believe I did. There was a summary judgment. And credibility is not I mean, you raised this in the brief in the direct appeal, right? I did. This is a better case. This is a subsequent case. And the court, what they ruled is that there were other things. But under Rufla, there were specific facts that the court decided. And those were the facts in the petition. Not other things that have to be decided. And because, for example, the court made a credibility issue determining what she should have, the court, under the petition, that's what I would respond to, the court can't say, well, these other things suggested. That's what the court had relied on. And there's other circumstances with regard to the false statement. Also, who caused the disturbance? And whether I lost my composure. I dispute that. And the reason why, you know, I follow all the directions of the officers. Nobody said that I did anything inappropriate or violated any of the court's orders. The statement from Zaire and Larson is false. Also, and over time, that will come out, particularly with regard to Larson, because he stated that he sent a letter to his carrier about what happened. And that letter may prove helpful. Because you know, at the time when they thought that there was a video, if they said, if they subsequently did, that I was chasing them all around the courtroom, that would be clearly false. So they didn't say that then. Nobody said I chased anybody. In the police report, he then states, and this is when he goes back to his office, and he has the officer that works with the city police in defending the cases. He then says I was chasing them around. He says I spit in his face, you know, saliva spit in his face. I was up close. I bumped him, and then I threatened to F him up. He didn't state any of that. And that's because it didn't happen. You know, at the time they were investigating an assault, which they shouldn't have because they were investigating an assault. That's the time when you say he was chasing them around. That's the time you say he thought he was going to get hit. After the officer asked Zaire what happened, the officer asked him did he feel threatened. That's because it wasn't, he didn't indicate that. It was only when he went back to the office where he talked with Mrs. Harper, who I think significantly vilifies, polarizes, and demonizes opposing attorneys, that she had this officer prepare a blatantly false report. And there's two items with regard to that. First, you can't, the officer can't, under his guidelines, file a police report in another jurisdiction unless it's a felony. And the person can't go back there. This wasn't a felony. He listed it as a felony so he could report it. And he just shouldn't have because he could have, there was no reason for him not to go back. But it was false. Another issue in it that is false is that he states I was abusive to a petite young white female attorney in his view later. That's false. He states this in order to vilify, demonize, and polarize opposing attorneys as Mrs. Harper encourages her deputies to do. And that's according to her supervisors. Finally, I would also note in supporting the disbarment the court uses cases 130 years old involves an attorney who killed somebody. A prisoner who he took out of jail and went to with a mob and lynched. This case is not that type of case. And I think that to discipline me, particularly to disbar me would be a grave injustice. There is nothing in the district court or ninth circuit that would warrant this type of disbarment. There was one case where it was dismissed, and that is the Lambie matter. In the Lambie matter, I would like just to clarify this because I think it is helpful in the case. And that is that in the Lambie matter, the court Judge Conte had taken all the matters from Judge Hamilton off calendar. He issued an order vacating all the trial dates of Judge James. Thereafter, prior to that, Judge James had set a November 19th hearing date for discovery. On October 8th, he said we're going to come back on November 19th for any further discovery. If there's any issues, we'll have a motion at that time. Judge Conte canceled all of Judge James' hearing dates, all pre-trial hearing dates. Zaire filed a motion for November 19th on November 11th. Since Judge Conte had already vacated all Judge James' dates, Judge James on November 12th vacated the November 19th hearing. There was no hearing. On the 20th, Judge Conte had a hearing. At that hearing, Judge Conte said bring any matters, any discovery matters to him. Any reasonable attorney would have believed that there was no motion pending on November 19th. The letter that was filed on November 11th, I didn't respond to. That was because Judge Conte had vacated the dates. If there was any questions about it, Judge James vacated the dates. Just to clarify, after the 20th, Judge Conte said anything, bring it back to me. That's why... But then he subsequently said that Judge James' order would be in effect. Then I was in a problem because now I had an order to comply with something that the client had difficulties complying with. We would have to... That would be difficult to do. There were issues with the client where compliance would not have been helpful. It became even more problematic once I discovered that there was a filed false police report against me. The client was subject to police action. We weren't going to go back with the type of order that he had. We needed to get it verified. We had to have something done. But the court when it heard the matter, dismissed it. Based on the order which was not responded to, we believe that we could have got some relief from that. Also, the discovery that he wanted was further, he wanted to discuss the arrest record of your client. Any arrest that he had recently, for example, he would have wanted to go over. That would have posed a difficulty. Also, the reason why he wanted the arrest record was for damages. Not liabilities. If anything, it would go to damages. For him to go back with that type of open-ended discussion, particularly based on how they have operated, would pose problems. We objected. On appeal, we believe the court would have reversed that order because it was made without an opportunity to respond. And in violation because the court had taken it off calendar. We have just a minute or so left. I have one other question I'd like to ask you. That's about the order by the district removing you. Do you know whether that order is a permanent disbarment or is there a time at which you can move for reinstatement? Under the reciprocal rules, you would simply be disbarred until the other jurisdiction. Since it's reciprocal, they don't have any means to get back. Yes, correct. They did it under the reciprocal. Is there any provision in any of the bar that would allow somebody who has been disbarred to petition for reinstatement? You can petition for reinstatement. You can't petition for reinstatement. I'm not sure that's a good way to put it. I'm not sure that's a good way to put it. What I plan to do is to present the new evidence to the court to see if the court will reconsider her decision. Because there are some new facts that have come out. The committee has indicated that Ms. Fillmore didn't see the original conference. That's what the court thought. When I say that, the committee in its brief states that Ms. Fillmore never claimed she saw the initial conference. They state that in their brief. It's indisputable that she didn't see what the court and the committee suggested that she did see. If I had also because I knew Ms. Fillmore didn't see it, what she was seeing was subsequent. She said she first saw me when an African American woman was with me. I was with the clerk. She couldn't have seen what happened earlier. One of the problems that I had, based on she clearly didn't see it, and the court saying she wasn't interested in what happened after the detention, and that's when Mr. Albrecht came in, I didn't address that in the original item because it was obvious that she didn't see it. The committee didn't try to correct it. On appeal, what they argue is not so much that she saw it, but whatever she saw it was just as harmful. The whole problem is that one, that's not what the judge said she saw, and two, that's not actually what she saw something else. You already made that point, and we're out of time. I'm going to review all the matters that you've presented. I'm going to consider all the points you made here today, and then I'm going to prepare a report and recommendation about the proper disposition of the reciprocal matter. That report and recommendation will be served on you, and you'll have an opportunity to file whatever response you deem appropriate. The report and recommendation, plus any filing that you may have, will be submitted to a three-judge panel of the court, and they'll decide whether to adopt my recommendation or not. That's what you can expect to occur. The other item, just in terms of proceedings, I think you did ask me, but the California Bar has a proceeding which is based on the Northern District. It's going to be heard in a couple of weeks. I'm not sure when that's going to be heard. I think I put it in the brief, but the first judge handled the matter, then all of a sudden she said she disqualified. I moved to disqualify the second judge, and that matter is pending. There was a trial date set earlier that was continued. Apparently, I just got word today that that date has been vacated. I'm not quite sure when that's going to go forward. This matter has helped in preparing for that matter, but I'll be adding a lot more witnesses to the list once we go to trial. Be sure to keep this court apprised. Would the court like me to prepare a brief just to locate some of the documents that we've discussed today? I think all the documents that you mentioned are in the record, other than the ones you just gave me, right? Yes, just in terms of where they are. I think we have everything. I know where to find the Fillmore testimony. The dates for . . . I think the record is 783, 193, and 187 are the dates for when Judge Conte . . . Judge Conte took it off calendar, and then there was a hearing . . . There's a very clear description of that in your papers about Judge Conte, the message of Judge James's order. You know about the thing that you said about Judge James's order that you did not follow because of Judge Conte's earlier statement that all matters would have to go to him. That's very clear from what you've already submitted. Just in terms of being able to locate the document . . . In fact, I think I have it here. The clerk's notice from Judge Conte is at 1253. The motion . . . Okay, so rather than have you try and do this now, I'll give you . . . Monday, you can submit a supplemental matter that will identify . . . key documents. And then the document that I submitted to the e-mail . . . I have three e-mails that you submitted. I will take that under submission as to whether that will be part of the record. Thank you very much. Thank you, Mr. Haynes, for your presentation today. For this matter, it's submitted pending the preparation of a report of recommendation as of next Monday when you will submit your supplemental filing. If not, we'll submit it Monday anyway. Thank you. . . . . . . . . . . . . . .
judges: Appellate Commissioner Shaw